LEO F. HUGHES, 3RD, A CITIZEN AND TAXPAYER OF THE TOWNSHIP OF EWING, COUNTY OF MERCER AND STATE OF NEW JERSEY, PLAINTIFF-APPELLANT, v. TOWNSHIP OF EWING, A MUNICIPAL CORPORATION OF THE STATE OF NEW JERSEY, AND THE CITY OF TRENTON, A MUNICIPAL CORPORATION OF THE STATE OF NEW JERSEY, DEFENDANTS-RESPONDENTS.

Superior Court of New Jersey
Appellate Division

Argued October 21, 1975—Decided November 6, 1975.

Before Judges KOLOVSKY, BISCHOFF and BOTTER.

*Mr. Arthur Meisel* argued the cause for appellant (*Messrs. Jamieson, McCardell, Moore, Peskin & Spicer,* attorneys; *Mr. Herbert F. Moore,* of counsel).

*Messrs. Dietrich, Allen & St. John,* attorneys for respondent Township of Ewing (*Mr. Charles P. Allen, Jr.,* of counsel and on the brief).

*Mr. George T. Dougherty,* City Attorney, argued the cause for respondent City of Trenton.

The opinion of the court was delivered by
BISCHOFF, J. A. D. Defendants Township of Ewing and the City of Trenton on December 31, 1974 entered into a

contract for the construction, operation, maintenance and management of a solid waste transfer facility to be located in Ewing Township. Plaintiff, a citizen of the Township of Ewing, filed a complaint in lieu of prerogative writs seeking a temporary and permanent injunction "enjoining defendants from acquiring, constructing, maintaining or operating 'such a facility' until a public referendum has been held" pursuant to *N. J. S. A.* 40:48–18. Cross-motions for summary judgment were filed, resulting in a judgment for defendants. Plaintiff appeals.

The Interlocal Services Act, *N. J. S. A.* 40:8A–1 *et seq.,* provides that local units of this State may enter into agreements with each other for the "joint provision within their several jurisdictions of any service which any party to the agreement is empowered to render within its own jurisdiction." The statute details the manner in which municipalities should proceed in entering into such agreements by the enactment of ordinances or resolutions. *N. J. S. A.* 40:8A–4.

Plaintiff does not contend that the agreement was adopted contrary to the provisions of that statute but does argue that *N. J. S. A.* 40:48–18 requires the approval of the voters before proceeding. That statute provides in part:

> No municipality under any such contract may acquire, construct, maintain or operate any property or service defined as a "public utility" by section 48:2–13 of the title Public Utilities, until a majority of the legal voters in the municipality affected voting at an election advertised, held and conducted in accordance with the laws relating to elections shall vote in favor of the proposition.

Plaintiff next points to the definition of "public utility" contained in *N. J. S. A.* 48:2–13. The term "public utility" as there defined includes "every individual, co-partnership, association, corporation * * * that now or hereafter may own, operate, manage or control within this State any * * * solid waste collection, solid waste disposal * * * plant or equipment for public use under privileges granted or hereafter to be

granted by this State or any political subdivision thereof. * * * ."1

Plaintiff argues that when the Legislature required approval by referendum pursuant to *N. J. S. A.* 40:48–18 of any "property or service defined as a 'public utility'" it intended to include more than an operating public utility within its provisions. He argues that the statute indicates the facility need not actually be a public utility to require voter approval, but only one of the properties or services listed in *N. J. S. A.* 48:2–13. By implication, plaintiff argues, that had the Legislature intended otherwise, the statute would have read "no municipality may operate any public utility as defined by section 48:2–13," rather than "no municipality * * * may * * * operate any property or service defined as a 'public utility' by section 48:2–13."

■ We disagree. What *N. J. S. A.* 40:48–18 refers to is not a physical structure such as a solid waste collection plant but rather the use thereof in the maintenance and operation of a "public utility." The term "public utility" as defined in *N. J. S. A.* 48:2–13, by its terms, is intended to refer to one maintaining and operating a business or service "for public use under privileges granted or hereafter to be granted by this State or any political subdivision thereof." It refers to one granted a franchise.

It has long been established that a public utility may not operate without a franchise granting such a right. * * * Generally speaking, a franchise is a privilege of a public nature conferred by government on an individual or corporation to do that "which does not belong to the citizens of the country generally by common right." In the case of public utilities, it means permission to *operate* a business, peculiarly of a public nature and generally monopolistic.

---

1The Solid Waste Utility Control Act of 1970, *N. J. S. A.* 48: 13A–3(b), defines solid waste collection as "the activity related to pick-up and transportation of solid waste from its source or location to a disposal site." A transfer station is defined as, "A facility at which solid waste is transferred from collection vehicles to haulage vehicles for transportation to a solid waste facility." *N. J. A. C.* 7:26–1.4.

\* \* \* [*In re Petition of South Lakewood Water Co.*, 61 *N. J.* 230, 238 (1972)]

See also, *In re Complaint by Morris Tp.*, 49 *N. J.* 194, 204 (1967).

A municipality, or two municipalities jointly, exercising solely for the benefit of their respective inhabitants, the "discretionary power to provide a municipal service for the collection and disposal of garbage" (*Pleasure Bay Apts. v. Long Branch*, 66 *N. J.* 79, 84 (1974)), within the municipality, is not operating a public utility pursuant to a franchise granted. See also, *Capasso v. Pucillo*, 132 *N. J. Super.* 542 (Ch. Div. 1974), aff'd 132 *N. J. Super.* 473 (App. Div.), certif. den. 65 *N. J.* 576 (1974). It follows that voter approval pursuant to *N. J. S. A.* 40:48–18 is not necessary here.

Having reached this conclusion, it is unnecessary for us to decide whether the provisions of the Interlocal Services Act, *N. J. S. A.* 40:8A–1 *et seq.,* omitting as it does all requirements for referendum approval of contracts entered into pursuant to the provisions thereof, is an implied repeal of the requirements of *N. J. S. A.* 40:48–18 for the conduct of a referendum insofar as public utilities may be the subject matter of such contracts.

The agreement between the defendants provides that, if both parties agree, the facilities may be made available to others than the two contracting parties. Should the parties proceed to do so, the operation of the joint project may then become a "public utility" requiring approval at a referendum pursuant to *N. J. S. A.* 40:48–18 for the maintenance and operation of the facility for others. That, however, is not the situation now presented to us, and we express no opinion thereon.

Affirmed.